# CHAPMAN v. THE UNITED STATES.

## MACARTNEY v. SAME.

CONSTITUTIONAL LAW; CONGRESSIONAL INVESTIGATING COM-
MITTEES, WITNESSES BEFORE.

1. Sec. 102, R. S. U. S., to enforce the attendance of witnesses before
   Congressional committees, is constitutional.
2. The resolution of the United States Senate, of May 17, 1894,
   appointing a committee to investigate newspaper charges of
   bribery and corruption of Senators in connection with the
   sugar schedule of a then pending tariff bill, and to ascertain
   whether any Senator had been or was engaged in speculating
   in sugar stocks, embraced a matter properly and constitu-
   tionally within the cognizance and jurisdiction of the Senate.
3. In the course of such an inquiry, questions propounded to a wit-
   ness summoned to appear before the committee, as to whether
   the firm of stockbrokers, of which witness was a member, had
   bought or sold sugar stocks during a certain period for or in
   the interest of any Senator, or was carrying any such stocks
   for any Senator, were pertinent to the subject matter of the
   inquiry that the committee was charged to investigate.

Nos. 405 and 406.  Submitted December 14, 1894.  Decided January 7, 1895.

HEARING on an appeal by the defendants (leave having
first been granted) from interlocutory orders overruling
demurrers to indictments found under Sec. 102, R. S. U. S.
*Affirmed.*

The COURT in its opinion stated the facts as follows:

This case comes into this court on an appeal specially
allowed from the judgment of the court below, overruling a
demurrer to the indictment against the appellant, Elverton
R. Chapman.

The appellant was indicted under Section 102 of the
Revised Statutes of the United States, providing for the

prosecution and punishment of contumacious witnesses summoned to give testimony before either House of Congress or committees thereof. It is averred in the indictment that the appellant was summoned and appeared as a witness before a special committee of the Senate of the United States, in relation to a matter of inquiry before said committee, and that he refused to answer questions pertinent to the matter of inquiry referred to such committee.

The section of the Revised Statutes under which the indictment was found, is as follows:

"SEC. 102. Every person, who having been summoned as a witness by the authority of either House of Congress, to give testimony or to produce papers upon any matter under inquiry before either House, or any committee of either House of Congress, wilfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than one thousand dollars nor less than one hundred dollars, and imprisonment in a common jail for not less than one month nor more than twelve months."

In connection with the foregoing Section 102 it is proper to read Section 104 of the Revised Statutes, which is as follows:

"SEC. 104. Whenever a witness summoned as mentioned in Section 102 fails to testify, and the facts are reported to either House, the President of the Senate or the Speaker of the House, as the case may be, shall certify the fact under the seal of the Senate or House to the District Attorney for the District of Columbia, whose duty it shall be to bring the matter before the grand jury for their action."

At the time the committee was raised, and the subject matter of inquiry was referred to it, the Senate had under consideration and debate the tariff act recently passed, known as the Wilson Bill, with a very large number of proposed amendments thereto, reported from the Finance

Committee of that body, on the 20th of March, 1894; and among these amendments thus reported, were certain proposed amendments providing for duties on sugar, different from the provisions in the bill as it had been passed by the House of Representatives and sent to the Senate. In the consideration of this matter, and in the rates of duties that might be fixed to be paid on imported sugar, it was supposed that the American Sugar Refining Company was largely interested and that the market value of the stock of that corporation would be materially affected, the one way or the other, by the ultimate action and judgment of the Senate. In this state of affairs, the matter became a topic of heated discussion with the public, and the press of the country teemed with imputations of bad faith and violated pledges, and some to the extent of charging attempted bribery and corruption, and that certain Senators were yielding to corrupt influences, and were acting, and intended to act, in a manner derogatory to their high duties of Senators and legislators of the nation. With these charges and imputations daily repeated, the Senate was impelled, by a proper sense of duty to itself and the country, to institute the proper proceedings for maintaining its dignity, integrity and purity, as an important branch of the legislative department of the Government. For this purpose, and acting upon the immediate inciting cause of certain publications recited in the preamble, the following preamble and resolutions were passed, on the 17th of May, 1894, raising a special committee, and clothing it with power of full investigation:

" *Whereas* it has been stated in the Sun, a newspaper published in New York, that bribes have been offered to certain Senators to induce them to vote against the pending tariff bill; and,

" *Whereas* it has also been stated in a signed article in the Press, a newspaper published in Philadelphia, that the sugar schedule has been made up, as it now stands in the proposed amendment, in consideration of large sums of money paid

for campaign purposes of the Democratic party; therefore,

"*Resolved*, That a committee of five Senators be appointed to investigate these charges, and to inquire further whether any contributions have been made by the Sugar Trust, or any persons connected therewith, to any political party for campaign or election purposes, or to secure or defeat legislation, and whether any Senator has been, or is, speculating in what are known as sugar stocks during the consideration of the tariff bill now before the Senate; and with power to send for persons and papers, and to administer oaths.

"*Resolved further*, That said committee be authorized to investigate and report upon any charge or charges which may be filed before it, alleging that the action of any Senator has been corruptly or improperly influenced in the consideration of said bill, or that any attempt has been made to so influence legislation."

Investigation was commenced, and according to the averments of the indictment, in the course of the investigation by the committee, the appellant was produced as a witness, being a member of a firm of stock brokers in the city of New York, dealing in the stock of the American Sugar Refining Company, and was asked by the committee, or a member thereof for the committee, whether the firm of Moore & Schley, of which the witness was a member, had bought or sold what were known as sugar stocks, during the month of February, 1894, and after the first day of that month, for or in the interest, directly or indirectly, of any United States Senator; had the firm, during the month of March, 1894, bought or sold any stocks or securities known as sugar stocks, for or in the interest, directly or indirectly, of any United States Senator; had the said firm, during the month of April, 1894, bought or sold any stocks or securities known as sugar stocks, for or in the interest, directly or indirectly, of any United States Senator; had the said firm, during the month of May, 1894, bought or sold any stocks or securities known as sugar stocks, for or in the interest,

directly or indirectly, of any United States Senator; was the said firm at that time carrying any sugar stock for the benefit of or in the interest, directly or indirectly, of any United States Senator. But the appellant, then and there, to wit, on the 9th day of June, 1894, each and all of said questions wilfully refused to answer; and all of which said questions are averred to have been pertinent to the inquiry then and there being made by the committee under the resolutions.

*Messrs. Shellabarger & Wilson* for the appellants:

1. These indictments must be quashed because the act upon which they are based is unconstitutional. Secs. 102 and 103, R. S. U. S., are parts of one scheme, and they are inseparable. The provisions of the act, in substance, are, that if any person summoned before a committee of the Senate shall refuse to testify, even though his testimony may tend to criminate him, he shall be deemed guilty of a misdemeanor, and punished. Such an act would be void, and the division of it into two sections does not relieve any part of it from this objection. *Baldwin* v. *Franks*, 120 U. S. 679; *Prosser* v. *Illinois*, 116 U. S. 252; *Va. Coupon Cases*, 114 U. S. 269; *U. S.* v. *Reese*, 92 U. S. 214. If Sec. 103 be eliminated, Sec. 102, standing alone, would be void. *The Trademark Cases*, 100 U. S. 82.

2. The committee of the Senate had no jurisdiction to inquire into the private affairs of the citizen, or to ask and receive answers to the questions upon the refusals to answer which these indictments are based. *Kilbourn* v. *Thompson*, 103 U. S. 168; *In re Pac. Rwy. Com.*, 32 Fed. R. 241; *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447; *Whitcomb's Case*, 120 Mass. 118; *McIntyre* v. *Mancius*, 3 John. Ch. 45; *Wilson* v. *Walker*, 2 Gray, 558.

Restraints upon the courts created by the Fourth and Fifth Amendments to the Constitution, protective of private rights and liberties, are equally applicable to proceedings in legislative bodies. *Emery's Case*, 107 Mass. 172; Cooley's

Con. Lim. (4th Ed.) 164, note 3 ; *Cullen* v. *Commonwealth,* 24 Grat. 624 ; *U. S.* v. *James,* 60 Fed. Rep. 261. Neither House of Congress has power to compel disclosures of private affairs by witnesses summoned before a committee except in a case in which the Constitution expressly conferred upon one or the other powers in their nature judicial, and which require the examination of witnesses. *Kilbourn* v. *Thompson, supra.*

A contempt proceeding must take on the definiteness of judicial prosecution. Contempt of court or of any other body entitled to punish for contempt is a specific criminal offense. *Hayes* v. *Fisher,* 102 U. S. 122 ; *New Orleans* v. *Steamship Co.,* 20 Wall. 357 ; *Ex parte Kearney,* 7 Wheat. 39 ; *Coggin* v. *Boies,* 34 Fed. R. 699. The Senate, in the exercise of its powers to punish for contempt, is a court of very limited and special jurisdiction, and in order to show its proceedings to be within its jurisdiction, every fact necessary to show that the case prosecuted belongs to one of these special classes must appear. Jurisdictional facts will not be presumed. *Kilbourn* v. *Thompson,* 103 U.S. 168, and cases cited ; 12 Am. & Eng. Ency. Law, 274 ; *Runkle* v. *U. S.,* 122 U. S. 555 ; 2 Freeman Judg., Sec. 527 ; *Grignon's Lessee* v. *Astor,* 2 How. 319 ; *Peacock* v. *Bell,* 1 Wms. Saunders, 73 ; *Byrd* v. *State,* 1 How. (Miss.) 163 ; *Harvey* v. *Tyler,* 2 Wall. 340 ; Cooley Con. Lim. (4th Ed.) 508 ; 1 Bish. Cr. Pro., Sec. 236, note 3 ; *Id.,* Sec. 169.

If the answers asked of Kilbourn (*Kilbourn* v. *Thompson, supra*) could lawfully be refused, then, *a fortiori,* can those asked the witness in the case at bar be refused without liability to punishment for such refusal.

If it is to be decided that this investigation looked to the aid of either the legislative or judicial functions of the Senate, such conclusion must be reached by sheer presumption, in the absence of all facts supporting it except that the investigation was ordered ; and, moreover, reached in defiance of the express declaration of the resolutions to the contrary.

Regarding the jealousy with which the courts guard against invasions of the rights secured by the Fourth and Fifth Amendments to the Constitution, and by the equivalent principles of the common law now embodied in those amendments, reference is made to the utterances of the Supreme Court in the following cases: *Boyd* v. *U. S.*, 116 U. S. 635; *Counselman* v. *Hitchcock*, 142 U. S. 580; *Paine* v. *Warren*, 33 Fed. Rep. 358.

As to an imprisonment by orders, judgments, or decrees made in absence of jurisdiction, being absolutely void in law, and constituting false imprisonment, and also as to such imprisonment not involving mere error, but being void owing to the absence of power or jurisdiction, and being relievable on *habeas corpus,* see *Wilson's Case,* 114 U. S. 417; *Mackin's Case,* 117 U. S. 348; *Bain's Case,* 121 U. S. 1; *Stebold's Case,* 100 U. S. 371; *Clarke's Case,* 100 U. S. 399; *Lange's Case,* 18 Wall. 163; *Nielsen's Case,* 131 U. S. 176; *Snow's Case,* 120 U. S. 274; *Roland's Case,* 104 U. S. 604; *Fisk's Case,* 113 U. S. 713; *Ayres' Case,* 123 U. S. 443; *Sawyer's Case,* 124 U. S. 200; *Cudhey's Case,* 113 U. S. 280; *Ex parte Terry,* 128 U. S. 289.

3. ˉSec. 102, R. S. U. S., under which these indictments are brought, is an attempt to delegate to the courts the power of the Houses to punish for contempt, and is palpably unconstitutional for that reason.

4. The indictments are bad for failing to aver facts showing an evil intent in refusing to answer.    *U. S.* v. *Carll,* 105 U. S. 612; *U. S.* v. *Britton,* 107 U. S. 669; *Cutler* v. *State,* 36 N. J. L. 135; *State* v. *Gardner,* 5 Nev. 312; *State* v. *Newkirk,* 49 Mo. 84; *U. S.* v. *Three RR. Cars,* 1 Abb. C. C. R. 196.

*Mr. Arthur A. Birney,* U. S. Attorney for the District of Columbia, and *Mr. Holmes Conrad,* Assistant Attorney General, for the United States.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This, so far as we are informed, is the first case of an indictment found under Section 102 of the Revised Statutes, or the act from which that section was formed. There have been many cases of contempt, on the part of witnesses, for refusing to answer questions on inquiries instituted by the Houses of Congress, since the passage of the original act of 1857, from which Sections 102, 103 and 104 of the Revised Statutes are taken; but in no case, prior to the present, so far as we are informed, have the proceedings reached the form of an indictment.

There is no serious objection urged to the form of the indictment. The great effort on the part of the appellant has been to show, and it has been urged with great ability, that the provisions of the statute, as embodied in Section 102 of the Revised Statutes, are unconstitutional and void; and that the scope and nature of the inquiry authorized by the resolutions of the 17th of May, 1894, were not within the limits of the power of the Senate of the United States, and therefore void.

In support of the demurrer to the indictment several positions have been strongly and ingeniously urged in argument; but we shall consider and determine the case as fully embraced by three principal questions—

1. "Is the Section 102 of the Revised Statutes of the United States constitutional and valid?

2. "Was the inquiry directed by the resolutions of the 17th of May, 1894, within the power of the Senate to execute by requiring witnesses to testify? and,

3. "Were the questions propounded to the appellant, the witness, pertinent to the subject matter of inquiry, that the committee was charged to investigate?"

If either of these propositions be resolved in the negative it would follow that the demurrer should have been

sustained; but, on the other hand, if they are all resolved in the affirmative it results that the demurrer was properly overruled.

1. With respect to the first of these questions, we can entertain no doubt. The section of the Revised Statutes brought into question, with some unimportant omissions and changes of phraseology, embodies the first section of the act of Congress of the 24th of January, 1857, entitled "An act more effectually to enforce the attendance of witnesses on the summons of either House of Congress, and to compel them to discover testimony." 11 Stat. 155. The history of Congress is full of instances where difficulties had been experienced in compelling unwilling and contumacious witnesses to make disclosure of facts essential to Congressional action; and it was found that the ordinary and incidental powers that pertained to the Houses of Congress in their separate capacities, were quite inadequate to meet the exigencies of many of the cases that occurred. It was for the remedy of this evil that the act of 1857 was passed.

That Congress possessed the constitutional power to enact a statute to enforce the attendance of witnesses and to compel them to make disclosure of evidence to enable the respective bodies to discharge their legitimate functions, cannot admit of serious question. Congress is invested with all the legislative power of the Government, and each House also with certain other powers, not legislative in their nature; and it is expressly provided that Congress shall have power to make all laws which shall be necessary and proper for carrying into execution the powers vested in it. Const. Art. 1, Sec. 8, Par. 18. Under this grant of power, what more natural and appropriate, as a means of executing its powers, and indeed necessary, than a statute providing for the discovery of evidence as the basis of action, and prescribing a punishment for those who contemn the authority of the body, and, by their contumacious conduct, obstruct the

lawful exercise of its functions? We have no doubt of the power of Congress in this respect.

It has been, however, strongly urged in argument that the terms of the section, 102, are sufficiently broad and comprehensive to include a class of witnesses protected and exempted by the provisions of Article V of the Constitution, and especially so when read, as urged it should be, in connection with the next succeeding section, 103, of the Revised Statutes; and therefore the section is void *in toto*. But it is not pretended that the appellant belongs to the class of witnesses contemplated by the article of the Constitution referred to; and if the contention of the appellant were conceded to be correct, as applied to a class of witnesses under different conditions, it would not follow necessarily that the statute should be stricken down in its entirety, because it may be susceptible of an unconstitutional application in certain cases that may possibly arise. This is not reasonable, nor is it in accordance with the rule of interpretation adopted by the Supreme Court of the United States, as applied to a statute good on its face, but where, by reason of its general and comprehensive terms, it may be made, by construction, to apply to objects forbidden by the Constitution. In such case the statute will be allowed its full force and operation, as applicable to all cases, rightfully and constitutionally within its provisions, but such application will be restrained as to those objects simply to which the statute is forbidden to extend. This is the rule, as we understand it, upon which the Supreme Court acted in the *State Freight Tax Case*, 15 Wall. 232; *Supervisors* v. *Stanley*, 105 U. S. 305, 313; *Virginia Coupon Cases*, 114 U. S. 269, and other cases that could be cited.

But we are not to be understood as conceding that any such rule of construction as that just stated is necessary to be invoked. It is not, by any means, necessary that Section 103 should be read with, or as part of, Section 102. The last mentioned section stands alone, and makes a complete

provision by its own terms, and it is in no manner dependent upon Section 103; and there is nothing in the terms of Section 102 that renders it liable to constitutional condemnation, whatever may be thought of Section 103. The statute must not be condemned as unconstitutional, if by any reasonable construction of its terms, it can be maintained as constitutional and valid. This is an undoubted rule of construction.

It has also been seriously contended in argument, that the act of 1857, now embodied in the Revised Statutes, was an attempt on the part of Congress to delegate its power and jurisdiction, or the power and jurisdiction of the several Houses thereof, incident and belonging to it as a legislative body, to punish for contempts, to the courts, and therefore the statute is void. But to this we cannot accede. The statute has never been understood, either by Congress itself or by the courts, as having any such purpose as that of an attempt to delegate the power of the Houses of Congress to commit for contempt of their authority. This is fully shown by the case of Irwin, who was, for refusing to testify, committed by order of the House of Representatives, in 1875, and who, unsuccessfully, attempted to be relieved on *habeas corpus*. And so in the case of Kilbourn, which occurred in 1876, where the witness was committed to prison by the order of the House of Representatives for refusing obedience to a subpœna *duces tecum*, and to testify, in regard to a matter referred to a committee for investigation, and for which imprisonment an action was brought. In that case, which underwent great consideration by the Supreme Court, it was never suggested or intimated that Congress had, or had attempted, to divest itself of, and relegated to the courts, the power to punish for contempts, in cases to which the power of each House properly extends, by the passage of the act of 1857. That Congress could not divest itself, or either House thereof, of that essential incidental power, inherent in it, may well be conceded. It is a constitutional incident of

the body; but it can only be exercised in such cases as to which the power of the Houses in their separate capacities extends.

But the existence of such inherent power in the Houses of Congress did not preclude the passage of the act of 1857, in the exercise of the ordinary legislative power of the two Houses of Congress, prescribing additional pains and penalties to those already existing by virtue of the inherent powers of the Houses of Congress, as legislative bodies. Nor did Congress express its meaning in any doubtful terms. By the very terms of the original act of 1857 it was declared that the recusant witness should, *in addition to the pains and penalties then existing,* be liable to indictment as and for a misdemeanor in any court of the United States having jurisdiction thereof, &c. In the Revised Statutes the terms "in addition to the pains and penalties then existing," have been omitted; but this omission can certainly not operate to make the statute import a sense that it never was intended to have, nor, consistently with the Constitution, could have. It is only by showing that the statute, as it stands in the statute book, is void, that the objection to it is available as a defense to the indictment; and the effort to show it void has utterly failed.

2. We come now to the question, whether the matter of inquiry directed by the resolutions of the 17th of May, 1894, was within the power of the Senate to execute, by requiring witnesses to testify. And in considering this question we must confess there is great difficulty in clearly and distinctly marking the boundaries within which either House of Congress may act with coercive power to compel the disclosure of facts, deemed important to it, and the rights of the citizen to exemption from inquiry into his private affairs. The question was most elaborately considered in the case of *Kilbourn* v. *Thompson,* 103 U. S. 168; but that case was presented in somewhat different aspect from the present. It must, however, be considered as established by that case,

that while, within certain limits and for certain purposes, either House of Congress may, where the examination of witnesses and the production of papers are necessary to the performance of its legal and constitutional functions, fine and imprison a contumacious witness, yet the Constitution invests neither House with *any general power* to punish for contempt. In that case it was also held, that the question whether either House of Congress, acting in the case of a witness refusing to testify, had proceeded within the limits and scope of its constitutional authority, is *a judicial question,* and one not to be concluded by the judgment of the body itself. In other words, that the House taking action in such case, is a body of limited and restricted powers, and whenever powers are exercised in excess or beyond the limits of those constitutionally possessed by the House, its action can afford protection to no one acting under its authorized order or command. In the Kilbourn case, the resolution of the House of Representatives, under which Kilbourn was summoned and examined as a witness, directed the committee to examine into the history and character of what was called "the real estate pool of the District of Columbia;" and the preamble recited, as the grounds of the investigation, that Jay Cooke & Co., who were debtors of the United States, and whose affairs were then in litigation in a bankrupt court, had an interest in the pool or were creditors of it. The subject matter of the investigation, therefore, was of judicial cognizance, and not legislative, and this was shown on the face of the resolution; and it was held, that there existed no power in Congress, or in either House thereof, on the allegation that an insolvent debtor of the United States was interested in a private business partnership, to investigate the affairs of that partnership, and consequently there was no authority in the House to compel a witness to testify on the subject. It followed that the order of the House, declaring Kilbourn guilty of a contempt of its authority, and ordering his imprisonment,

was void, and afforded no protection to the sergeant-at-arms in an action against him for false imprisonment. It was emphatically declared by the court, " that no person can be punished for contumacy as a witness before either House, unless his testimony is required in a matter into which that House has jurisdiction to inquire, and we feel equally sure that neither of these bodies possess the *general power* of making inquiry into the private affairs of the citizen."

In the case now before us the subject matter referred to the committee for investigation was altogether different in its nature, and involved questions and consequences, wholly unlike the subject matter referred to the committee in Kilbourn's case. It was a matter immediately and most seriously affecting the Senate itself, and the great legislative trust confided to its members by the people, or the States of the Union. The dignity of the body, and the integrity and purity of some of its members, were openly and seriously questioned, and that too in a manner well calculated to destroy public confidence in, and bring odium and reproach upon that important branch of our national legislature. The charges or imputations referred to in the resolutions, the truth of which was made the subject of inquiry, not only affected pending legislation with distrust, but were of a nature, if found to be true, to subject members of the body to reprimand or expulsion, and other guilty parties to punishment, at the hands of the Senate. But nothing could be done until inquiry was made and the facts brought to light. A preliminary investigation was therefore necessary. And for the purposes of the inquiry, no more formal proceedings were required than those adopted by the Senate. No technical formality was required; and no specific charges could, in justness and fairness, be formulated against any member of the Senate, or any other person, until the facts could be ascertained upon which to proceed; and it certainly cannot be true that the Senate is powerless in such case to elicit the facts. What the ultimate action of the Senate should or

may be, upon the facts when ascertained, is not the question for the court to determine, but simply whether the inquiry instituted forms a subject matter properly and constitutionally within the cognizance and jurisdiction of the Senate. That the subject matter was within its jurisdiction, we entertain no doubt. And having power and jurisdiction of the subject matter of inquiry, the Senate by its committee had full and ample power to compel the attendance of the appellant as a witness, and to require him to answer any question pertinent to the matter of inquiry embraced by the resolutions. There is no pretense that the answers to the questions propounded would or could criminate the witness in any way, and it was his clear duty as a citizen to obey the law, and to answer the questions without respect to the persons to be affected. His refusal was at his peril, and he must abide the consequences prescribed by the statute.

It has been strongly insisted in argument that because the specific ulterior purpose of the investigation was not avowed or declared on the face of the resolutions, and thus made to appear, affirmatively and in terms, that the Senate, by instituting the investigation, intended the exercise of some of its acknowledged powers, such as the expulsion or censure of its members, the punishment of parties for attempting to corrupt members, or for conduct otherwise calculated to bring the body into scandal and contempt with the people, therefore there was no power to require disclosure of facts, though pertinent to the inquiry authorized to be made. But to the correctness of this contention we cannot assent. The subject matter of inquiry being within the jurisdiction of the Senate, the court cannot assume that the body intended the investigation as a mere idle, prying, inquisitive proceeding, without ultimate aim or object. We must assume that the object and design of the inquiry was intended for legitimate purposes, and not for the accomplishment of that which would be unlawful.

The resolutions of reference to the committee do not, in

terms, require the committee to report their proceedings to the Senate. But that was necessarily a part of their duty; for it is an established principle, " that when their acts and proceedings are agreed to they become the acts and proceedings of the House ; it is consequently the duty of committees both to proceed under the authority given them, and to report their proceedings to the House." Cush. Parl. Law, Sec. 1930.

3. The last question to be considered is, whether the questions propounded to the appellant were pertinent to the subject matter of inquiry before the committee. This question would seem to need but little to be said in regard to it. Each and all of the questions had reference to and sought to elicit the information, whether the stockbrokers' firm to which the appellant belonged, had bought or sold, during the months of February, March, April, and May, 1894, sugar stocks for or in the interest, directly or indirectly, of any United States Senator, or were carrying such stocks for said Senators. If these questions had been answered in the negative, this fact thus proved would have gone far towards relieving Senators of the charge or imputation of using and abusing their position as Senators, for the purpose of making selfish gain in the stock market. While, on the other hand, if the answers had been in the affirmative, the fact thus disclosed would have subjected the Senator or Senators involved, not only to the animadversion of the public, but to censure, if not expulsion from the body to which he or they belonged, by his or their fellow Senators. This was plainly within the scope of the inquiry, and was that to which the resolution referred, when it directed the committee to inquire " whether any Senator has been, or is, speculating in what are known as sugar stocks during the consideration of the tariff bill now before the Senate." Whether the questions propounded by the committee, or by the Senate, were pertinent is *a judicial question,* and is an essential element in the offense charged ;

but we are clearly of opinion that the questions set out in the indictment, and which the appellant refused to answer, were all pertinent to the inquiry given in charge to the committee.

Upon the whole, this court is of opinion that the indictment is good and sufficient, and that the demurrer thereto was properly overruled by the court below; and that the demurrer in the similar case of the *United States* v. *John W. Macartney*, also on appeal to this court, and submitted with and to be determined on the arguments in the case against Chapman, the present appellant, was also properly overruled by the court below; and that the judgments entered on the demurrers in both cases must be affirmed; and it is so ordered.                    *Judgments affirmed.*